UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
Harold JACOB,

       Plaintiff,

 -against-          MEMORANDUM AND ORDER
                05-CV-1739 (ILG)

KIMBERLY-CLARK CORP.,

       Defendant.
-------------------------------------------------x

GLASSER, United States District Judge:

## INTRODUCTION

   Harold Jacob ("plaintiff" or "Jacob") brings suit against Kimberly-Clark Corporation ("defendant" or "KC") for alleged violations of a patent licensing agreement ("License Agreement"). The Amended Complaint ("Am. Compl.") alleges conversion, breach of contract, fraud, negligence, and breach of fiduciary duty and requests alternative forms of relief including declaratory judgment, injunction, accounting, rescission, and the imposition of a constructive trust. Defendant moves to dismiss the majority of these claims.

## BACKGROUND

**I. History of the Agreement**

   This dispute arises out of a patent licensing agreement between plaintiff-licensor and a subsidiary of the defendant as licensee and a subsequent assignment

("Assignment") of plaintiff's interest in that patent to the defendant.[1] The Agreement between plaintiff and Arrow Precision Products, Inc. ("Arrow") (the "licensee") was entered into March 1, 1994. In or about November of 1995, plaintiff assigned the entirety of his partial interest in the patent to Arrow. The parties do not dispute that, in or about April of 1996, Arrow assigned the License Agreement to a division of the defendant, KC.

The License Agreement granted Arrow a "worldwide, exclusive license, with the right by Licensee to grant sublicenses...and to make, have made, use and sell Licensed Products" ("Agmt.," Attached to <u>Def. Mem.</u>, Ex. B § 3.01). Jacob, plaintiff and licensor, received royalties subject to a payment schedule. Agmt. § 4.01. The License Agreement provided in relevant part as follows:

2.01    Licensee will pay the cost of prosecuting and maintaining the Patent Rights Listed on Appendix A using patent counsel selected by Licensee. Licensor will fully cooperate with Licensee in preparing, filing, prosecuting and maintaining such applications and patents.

2.03    Licensee may, upon reasonable notice to licensor, decide to discontinue paying the expenses associated with any particular application or patent. If Licensee decides to discontinue paying such expenses, Licensor may pay such expenses. If Licensee declines to apply for a patent application for an invention of Knowhow[2] then Licensor may at its sole discretion decide to pursue such application. Licensee shall retain no further rights in any application or patent which (1) Licensee declines to patent and licensor does patent or (2) Licensee decides to discontinue paying such expenses and for which Licensor assumes such responsibility.

3.01    Licensor grants to Licensee and Subsidiaries a worldwide, exclusive

---

[1] The Agreement dealt with both present and future inventions by plaintiff, an expert in the field of gastroenterology and catheter devices.

[2] Section 1.02 of the Agreement defines "Knowhow" as "all technology, inventions, technical information, application concepts and the like whether patentable or not, which are in the Field and which are discovered, invented or developed by Licensor solely or jointly with others."

| | |
|---|---|
| | license, with the right by Licensee to grant sublicenses, under Knowhow and Patent Rights to make, have made, use and sell Licensed Products. |
| 5.02 | Licensee and Subsidiaries shall maintain the usual books of accounts…showing sales of Licensed Products, Net Sales…, amounts received from sublicenses and Net Proceeds attributable thereto. Such books and records shall be open to inspection by Licensor during usual business hours and upon reasonable notice, by an independent certified public accountant appointed by Licensor and as to whom Licensee has no reasonable objection…for the purpose of verifying the accuracy of the payments made…Licensor agrees that the books and records of Licensee and Subsidiaries contain confidential business information and further agrees that Licensor will not divulge to third parties information obtained as a result of such inspection. |
| 9.01 | Licensee shall have the right, in its sole discretion and at its sole expense, to initiate, prosecute and conclude legal proceedings in Licensor's name or its own name against any infringer of Patent Rights…. |
| 9.02 | In the event Licensee initiates…legal proceedings to enforce Patent Rights…, Licensor shall fully cooperate with and supply all assistance reasonably requested by Licensee. Licensor, at its expense, shall have the right to be represented by counsel of its choice in any such proceeding, provided that Licensee shall have the sole right to conduct such proceedings and to enter into any settlement thereof. |
| 10.01 | This Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Pennsylvania. |

In a letter to Jacob dated November 8, 1995, Kenneth George, counsel for Arrow, sought an assignment from Jacob of his title to patents embraced by the License Agreement in order to "greatly simplify the filing and prosecution of the corresponding foreign [patent] applications… [and to] make it simpler to enforce [Jacob's] patents against third parties by way of litigation." Am. Compl. ¶ 7. On November 27, 1995, Jacob granted that Assignment. He alleges that he received no consideration for the Assignment, and asserts that he agreed to it in reliance on George's aforementioned statement as well as his proposal that "in the unlikely event that Arrow Precision seeks

3

to terminate the License Agreement, Arrow Precision will make y you [sic] a co-owner of the patents by assigning your rights back to you." Am. Compl. ¶ 7.

Although the language of the Assignment provided Arrow with patent rights "to be held and enjoyed by the Assignee for its own use and benefit,"[3] the plaintiff contends that the patent rights that were assigned to KC were to be held by it as trustee for his benefit. Am. Compl. ¶ 30.

"Subsequent to his execution of the Assignment, Jacob requested in writing that KC reassign his Patent Rights to him." (¶ 12). In response, in an undated letter, Dennis Cox, KC's Director of Marketing, Ballard Medical Products (a division of KC) stated that:

> We [,KC,] also concluded that [Jacob's] original joint ownership rights in the patents and patent applications governed by the 1994 agreement should be re-assigned to [Jacob]. This reassignment will place [Jacob] in the same legal position [he was] in prior to [his] assignment of [his] joint ownership rights to Arrow. Please note that we will retain those joint rights in the patents and patent applications which we received from Arrow and which were based upon the rights of the other co-inventors. The net effect of the re-assignment will be for [Jacob] and Ballard to be joint owners of the patents and patent applications.

Am. Compl. ¶ 12.[4]

Jacob alleges that he relied upon this promise until November 26, 2003, when he

---

[3] In pertinent part, the Assignment reads:
…the Assignor has sold, assigned and transferred, and by these presents does hereby sell, assign, and transfer unto the Assignee the entirety of the partial right, title and interest of Assignor in and to the aforesaid patents, the aforesaid applications, the aforesaid inventions, and each and every patent that may be issued on the aforesaid inventions in the United States of America and in its territories and possessions, and also in all countries foreign to the United States of America, the same to be held and enjoyed by the Assignee for its own use and benefit, and for the use and benefit of its successors, assigns or other legal representatives to the end of the term or terms for which a patent or patents may be granted as fully and entirely as the same would have been held and enjoyed by the Assignor if this Assignment had not been made.
Def. Mem. Ex. B, "Assignment".

[4] Importantly, even prior to the assignment, Jacob was a joint owner of the patent along with Ballard. The record does not reflect that he ever held any interest greater than this joint-ownership in the patent.

4

received a letter from KC's attorney refusing to reassign the patent rights to him. Am. Compl. ¶¶ 13, 108.[5]

In March, 2004, he demanded by letter that he and his attorney be permitted to inspect the books and records of KC. Am. Compl. ¶ 83. Also in that month, Jacob, through his attorney, wrote KC, ostensibly rescinding the Assignment. On March 16, 2004, KC wrote Jacob, recognizing its failure to pay him a portion of his proceeds and remitting to him a check for those proceeds. Id. ¶ 84. In July of 2004, Jacob again sent a letter demanding he and his accountant be allowed to inspect the licensee's books. Id. ¶ 45. In September of 2004, KC responded by requiring them to sign a confidentiality agreement, and demanded that neither Jacob nor his attorney be present at the inspection. Id. ¶ 86. On April 6, 2005 the Complaint was filed.

## II. The Amended Complaint

The Amended Complaint of 109 rambling paragraphs alleging seventeen "causes of action" arising from defendant's alleged activities is summarized in discrete groups as follows:

### A. Breach of Contract Allegations

Plaintiff alleges that the defendant failed to give "reasonable notice," as required by § 2.03 of the License Agreement, and that it decided to discontinue paying the expenses associated with the foreign patent application ("PCT application").[6] Pls. Mem. 5). (Tenth Cause of Action ¶ 73). Plaintiff also alleges that defendant refused to permit

---

[5] Although plaintiff relies upon this exchange of letters, they were not submitted with the Amended Complaint.

[6] The PCT application included a "Surgical Combination Inject and Snare Apparatus" which was among the inventions Jacob assigned to defendant's predecessor in 1995.

him to inspect the defendant's books in violation of § 5.02 of the License Agreement. (Twelfth Cause of Action ¶¶ 79-88). Finally, in his thirteenth cause of action, the plaintiff alleges breach of a duty of good faith and fair dealing in that KC failed to "exercise reasonable efforts to maximize sales of Licensed Products and….prosecute legal proceedings against those whom [KC] had reason to believe were infringers of Jacob's Patent Rights. ¶¶ 89-93.

### B. Tort Allegations

In his fourth cause of action the plaintiff alleges that the defendant converted to its own uses undisclosed income. ¶¶ 41-47. His eleventh cause of action states that defendant has negligently failed to monitor the PCT application prosecution. ¶¶ 76-78.

### C. Fraud Allegations

In his fifteenth cause of action plaintiff alleges that (1) he granted the 1995 Assignment based on false representations upon which he relied; (2) KC, aware of its assignor's fraudulent procurement of the Assignment, adopted it nevertheless; (3) He relied on KC's false material representations that it would re-assign his rights to him which induced him to forbear pursuing his legal rights; (4) KC fraudulently concealed its relationship with third parties concerning the patent rights, causing him to forbear pursuing his rights. ¶¶ 96-102.

### D. Trust/ Fiduciary Duty/ Equity Allegations

His second cause of action alleges the creation of an express trust arising from the Assignment of his patent rights. ¶¶ 29-32. His third cause of action alleges that KC had a fiduciary duty of reasonable care regarding the value of the patent rights for Jacob's benefit, and that it violated that duty by entering into undisclosed agreements with

infringers. ¶¶ 33-40. His fifth and seventh causes request the Court to recognize a constructive trust arising from the assignment or, in the alternative, "undisclosed and improper profits" in connection with undisclosed third party agreements. (Fifth [¶¶ 48-51], Seventh [¶¶ 54-56] Causes of Action).

### E. Remedial Claims

Based upon the foregoing variegated causes of action, the plaintiff claims entitlement to a declaratory judgment (First [¶¶ 25-28], and Sixteenth [¶¶ 103-106] Causes of Action ); Rescission (Sixth [¶¶ 52-53], Fourteenth [¶¶ 94-95], and Seventeenth [¶¶ 107-109] Causes of Action); Accounting (Eighth Cause of Action [¶¶ 57-61]); and Mandatory Injunction (Ninth Cause of Action, [¶¶ 62-68]).

## DISCUSSION

### I. Rule 12(b)(6)

When material outside the complaint is presented to and not excluded by the court, "the motion shall be treated as one for summary judgment and disposed of as provided in [Federal Rule of Civil Procedure] 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion...." Fed.R.Civ.P. 12(b). Cf. Chambers v. Time Warner Inc., 282 F.3d 147 152-3 (2d Cir. 2002). However, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Id. (citations omitted). Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint. Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir.1995) (per curiam) (quoting

7

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir.1991)).

The defendant filed copies of both the Agreement and the Assignment with its motion. The Court considers them without converting the motion to a Rule 56 motion for summary judgment, since plaintiff's claims are principally based upon these documents.

On a 12(b)(6) motion, the Court accepts as true the factual allegations in the complaint, viewing it in light most favorable to the non-moving party. Crespo v. New York City Transit Authority, 2002 WL 398805 (E.D.N.Y. 2002) (Glasser, J.) (citing Bolt Elec., Inc. v. City of N.Y., 53 F.3d 465, 469 (2d Cir. 1992)). Dismissal under Rule 12(b)(6) is only appropriate if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of her claim which entitle her to relief." Walker v. City of N.Y., 974 F.2d 293, 298 (2d Cir. 1992).

## II. The Undisputed Claims

Plaintiff fails to reply to defendant's arguments against several causes of action which are therefore deemed abandoned. City of New York v. Minetta, 262 F.3d 169, 181 (2d Cir. 2001). Those causes of action included the ninth cause (injunction), the eleventh cause (negligence), the sixteenth cause (declaration that assignment is void), the seventeenth cause (unilateral rescission) and the fifth and seventh causes (constructive trust).[7] These claims are therefore dismissed.

Additionally, defendant admits in its Response Memorandum, that plaintiff's

---

[7] In his reply brief supporting rescission of the agreement, plaintiff does argue that money damages will not compensate him, but fails to assert this on behalf of his constructive trust claims. He also fails to rebut one of defendant's arguments against these claims, namely, that they are time barred. They are therefore deemed abandoned.

fourteenth claim for rescission of the licensing agreement is properly stated, so this claim survives. Def. Rep. 13.

**III. Contract Claims**

Defendant moves to dismiss the twelfth and thirteenth claims. Plaintiff's twelfth claim alleges that the refusal to allow Jacob and his accountant to inspect the books, and the demand that the accountant sign an "onerous" confidentiality agreement before inspection both violated the Agreement. In opposition, defendant contends that the Agreement gave KC the right to take those actions.

The contract only provides that plaintiff not divulge confidential information obtained by the inspection to third parties. See, Agmt. § 5.02. It does not provide that defendant may make the signing of a confidentiality agreement a prerequisite to inspection. Whether or not the License Agreement gave Jacob the right to inspect the books without an accountant cannot be resolved on a motion to dismiss, and therefore the motion is denied with respect to the twelfth claim.

Plaintiff's thirteenth claim alleges that defendant breached the implied duty of good faith and fair dealing in (1) failing exercise reasonable efforts in selling patented products and (2) failing to prosecute infringers because of a conflict of interest. Am. Compl. ¶¶ 89-93. Defendant concedes that the first of these two assertions is adequately pleaded, but contends that the "failure to prosecute infringers" claim is too vague to give notice of the claim under Fed.R.Civ.P. 8. Defendant therefore asserts that the claim should be dismissed or, in the alternative, stricken with leave to amend.[8]

---

[8] In its initial memorandum in support of the motion, defendant argued that § 9.01 of the License Agreement gave KC the right, in its "sole discretion," to decide whether or not it was going to prosecute infringers. This is undisputed. However, plaintiffs argument is that this discretion was not exercised in

Rule 8 states that a complaint "shall contain…a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The Court has the power, "on its own initiative or in response to a motion by the defendant to strike any portions that are redundant or immaterial." Salahuddin v. Cuomo, 861 F.2d 40, 43 (2d Cir. 1988) (citing Fed.R.Civ.P. 12(f)). Dismissal is usually reserved for instances in which the complaint is "so confused, ambiguous, vague, or otherwise unintelligible" that its true substance is disguised. Id. (citing Gillibeau v. City of Richmond, 417 F.2d 426, 431 (9th Cir. 1969)). The Court has discretion to grant a plaintiff leave to amend and, pursuant to the direction in Fed.R.Civ.P. 15(a), should do so "when justice so requires."

Here, the plaintiff has asserted two separate violations of defendant's duty of good faith and fair dealing. The Amended Complaint as a whole gives adequate notice of its substance, including allegations that specific actors such as Boston Scientific were allowed to infringe the patent, an event on which his allegation of conflict of interest is predicated. Defendant's argument that this claim violates Rule 8 is therefore rejected.

**IV. Conversion Claim**

Plaintiff's fourth cause of action, conversion, alleges that defendant kept royalties to which plaintiff was rightfully entitled. Defendant asserts that the "economic loss doctrine" bars recovery because the claim properly sounds in contract.

"To establish a cause of action in conversion, the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in

---

"good faith" because KC labored under a "conflict of interest." KC's reply therefore only makes the argument that the "conflict of interest" is not pleaded with specificity.

question…to the exclusion of the plaintiff's rights…Tangible personal property or specific money must be involved." Fiorenti v. Central Emergency Phys., PLLC, 305 A.D.2d 453, 455 (2nd Dep't 2003) (quoting Indep. Discount Corp. v. Bressner, 47 A.D.2d 756, 757 (2nd Dep't 1975)). A conversion claim cannot be predicated upon an equitable interest, and it must have reference to "specific articles of property." Laurent v. Williamsburgh Savings Bank, 137 N.Y.S.2d 750, 753 (N.Y. Sup. Ct., 1954). Finally, "[a]n action for conversion cannot be validly maintained where damages are merely being sought for breach of contract." Peters Griffin Woodward, Inc., v. WCSC, Inc., 88 A.D.2d 883, 884 (1st Dep't 1982). Here, plaintiff asserts an entitlement to royalty revenues, not specifically identifiable money. Moreover, these damages plainly relate to a breach of contract. For both reasons, an action for conversion does not lie.

The cases cited by plaintiff are inapposite, either because they deal with specific, tangible property, see, e.g., Mosallem v. Matrix Intern. Logistics, Inc., 2004 WL 97690 (S.D.N.Y. 2004) (conversion of warehoused goods); Apple Records, Inc. v. Capital Records, Inc., 137 A.D.2d 50 (1st Dep't 1988) (conversion of recordings and records), or because they assert a breach of a duty independent of the contract. See, e.g., Carvel Corp. v. Noonan, 350 F.3d 6 (2d. Cir 2003) (tortious interference with contract claim); Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp., 725 F.Supp. 656 (N.D.N.Y. 1989) (negligence claim barred by "economic loss" doctrine). Here, the facts giving rise to the conversion and breach of contract claims as well as the damages resulting therefrom are indistinguishable, and plaintiff fails to define a duty separate from the contractual obligation to pay royalties. Therefore, defendant is entitled to dismissal of the conversion claim.

## V. Fraud Claim

Jacob asserts that Arrow induced him to consent to the Assignment based on the allegedly fraudulent assertions that it was only for the purpose of more efficiently prosecuting patents and that his rights would be unaffected by the assignment. He further alleges that KC knew of and endorsed this "fraud" when it assumed the License Agreement, and that it continued to conceal the fraud by promising to reassign the rights in 2001 and reneging in 2003.

KC makes three arguments in opposition: first, that these claims are time-barred; second, that the 1995 representation that an Assignment would "simplify" foreign patent prosecution and protection was mere puffery,[9] and therefore not actionable; third, that Jacob could not have relied to his detriment on the 2001 promise to reassign his patent rights, since those statements occurred nearly six years after the Assignment.[10]

Common law fraud requires a showing of 1) misrepresentation of a material fact, 2) falsity, 3) scienter, 4) reliance, and 5) injury. Shisgal v. Brown, 21 A.D.3d 845, 846-47 (1st Dep't 2005) (citing Channel Master Corp. v. Aluminium Ltd. Sales, 4 N.Y.2d 250 (2003)). Under New York law, the statute of limitations for fraud claims is the greater of six years from the date the cause of action accrued or two years from when it should

---

[9] Defendant's Memorandum of Law characterizes the statement as "puffery," although, as the case law makes clear, it is more properly considered an "opinion" or "future prediction."

[10] As part of the fraud cause of action, Jacob alleges that the 2001 promise to reassign his rights was a means of fraudulently concealing the defendant's secret relationship with Boston Scientific. Am. Compl. ¶ 101. There is no plain statement of how these two alleged events are related, and whether plaintiff intends to plead a separate fraud claim under the 2001 promise. The Court treats the fraud claim as arising from alleged representations made regarding the 1995 Assignment only. The Court therefore does not consider KC's third argument, since it is directed at a non-existent fraud claim arising from the November 2001 letter. It should be noted, however, that KC's 2001 promise to return the patents could constitute concealment of the original fraud, and thus be relevant for purposes of tolling the statute.

have been reasonably discovered.  C.P.L.R. § 213(8).[11]

Jacob alleges that Arrow's attorney, in a letter dated November 8, 1995, promised that the Assignment would not affect his <u>financial</u> <u>rights</u>, that it was merely to "simplify the filing and prosecution of the corresponding foreign [patent] applications… (Am. Compl. ¶¶ 7, 97), and that if Arrow terminated the License Agreement, it would make him co-owner of the patents.  None of these statements permit plaintiff's fraud claim to survive a motion to dismiss, since they cannot be considered misrepresentations.  First, Jacob retained, and still retains, all <u>financial</u> <u>rights</u> he had by virtue of the License Agreement, and plaintiff cannot point to any financial right he no longer possesses.[12]  Second, the representation that the patents would be returned to him was conditioned on the termination of the License Agreement by KC--a right it alone held under § 6.02.  Since the License Agreement has not been terminated, KC is not even arguably obliged to return the rights.  KC does not deny that, in the event the License Agreement is terminated, co-ownership rights would be returned to plaintiff.[13]

This leaves plaintiff with only one representation referred to in the Amended Complaint that might possibly give rise to a fraud claim: that the purpose of the Assignment was to "simplify" foreign patent prosecution.  However, plaintiff does not

---

[11] Section 213(8) states: "An action based upon fraud…must be commenced…the greater of six years from the date the…action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."

[12] Plaintiff argues, in the context of his trust claims, that he lost rights to have his patents returned to him and to prosecute infringers when he signed the Assignment.  These arguments fail in the trust context and therefore fail here as well.  See discussion, infra, Part VI.

[13] Based on the allegations in the Complaint and the language of the License Agreement, it is clear that the November 2003 refusal to reassign plaintiff's rights is irrelevant.  KC was obliged to return the patent rights if and only if the Agreement was cancelled or terminated.  KC's refusal to voluntarily return the patent rights is therefore not a violation of this promise.

dispute in either the Amended Complaint or his legal memorandum that giving the licensee title to the patents simplified patent prosecution and was therefore no misrepresentation.

Defendant is also correct that any representation that the transfer was merely to "simplify" foreign patent prosecution because such a statement cannot serve as the basis for a claim of fraud. Chase Manhattan Bank, N.A. v. Perla, 65 A.D.2d 207, 210 (4th Dep't 1978) ("representations of opinion or predictions of some thing which it is hoped or expected will occur in the future will not sustain an action for fraud"). See also Adams v. Clark, 239 N.Y. 403, 410 (1925) ("Mere promissory statements as to what will be done in the future are not actionable"); Country-Wide Leasing Corp. v. Subaru of America, 133 A.D.2d 735, 736 (2d Dep't 1987) (dismissing claim of fraudulent misrepresentation since it was predicated upon an expression of future expectations rather than existing fact). Clearly, a statement that an assignment of title would simplify patent prosecution abroad is a prediction of the benefits to be achieved from the Assignment.

In sum, plaintiff's only argument is the alleged promise that his economic rights would not change. They did not. Plaintiff makes no other argument as to how this statement may be construed as a misrepresentation. Because the fraud claim lacks any misrepresentation upon which to stand, defendant's motion to dismiss this cause of action is granted.

## VI. Trust/ Fiduciary Duty Claims

### A. Plaintiff's Theory

Jacob urges the Court to find that the License Agreement and Assignment gave

rise to a trust. In the first cause of action Jacob requests relief declaring him the "beneficial owner" of the patents. What Jacob means by "beneficial owner" is unclear. The phrase "beneficial owner" has been used in the copyright context to refer to the former owner of a copyright who has given up his rights in it in exchange for royalties. (Cf., Fantasy Inc. v. Fogerty, 654 F.Supp. 1129, 1130 (N.D. Cal. 1987)). If this is all that Jacob means, it is clear the claim must be dismissed because his right to royalties is undisputed–leaving no case or controversy. Accord, Evers v. Dwyer, 79 S.Ct. 178, 179, 358 U.S. 202, 203 (1958).

Jacob's second cause of action requests a declaration "that the Assignment created a trust, pursuant to which...[KC] hold[s] the patent rights in trust for Jacob..." Am. Compl. ¶ 32. Because of the peculiar structure of his trust claim, some detail is required. Jacob asserts that a trust arose from the following chain of events. First, Jacob agreed to license his patents to Arrow and its successors for their exclusive, worldwide use. However, Jacob asserts, he retained two important rights by this agreement. First, he contends that section 2.03 of the License Agreement provides him with a reversionary interest in knowhow, inventions, and patents when licensee "decide[s] to discontinue paying the expenses associate with any particular application or patent." Agmt. § 2.03. Second, Jacob asserts that section 9.01 of the License Agreement allows him to prosecute infringers based on his legal interest in the patents. Section 9.01 gives the licensee "in its sole discretion and at its sole expense" the right to conclude legal proceedings in the licensor's name or its own name against infringers. Pls. Mem. 20.

Jacob subsequently assigned all of his rights in the patents to Arrow for its own

15

"use and benefit." Despite the language of the Assignment, Jacob contends that it was never intended to eliminate the rights he retained under the License Agreement. He asserts that he was promised that he would lose no financial rights held under the License Agreement by making the Assignment. Since the rights allegedly reserved to him could only be enforced by the titular owner, he asserts that the Assignment created a trust by which KC, as title holder, was obligated to exercise its use of the patent for the benefit of Jacob. ¶ 31.

### B. Elements of a Trust

A trust is "a fiduciary relationship regarding property and charging the person with title to the property with equitable duties to deal with it for another's benefit…" Black's Law Dictionary, 1546 (8th ed., 2004). To establish a trust under New York law, plaintiff must show four essential elements: "(1) a designated beneficiary, (2) a designated trustee, (3) a clearly identifiable res, and (4) delivery of the res by the settlor to the trustee with the intent of vesting legal title in the trustee." Brod, Inc. v. SK&I Co., L.L.C., 998 F.Supp. 314, 325 (S.D.N.Y. 1998). Although a trust can be created orally or by conduct Agudas Chasidei Chabad of United States v. Gourary, 833 F.2d 431, 433-4 (2d Cir. 1987), and proof of its existence can be had by the introduction of parole evidence Elyachar v. Gerel Corp., 583 F.Supp. 907, 922 (S.D.N.Y. 1984), evidence of a trust must be unequivocal. Id. ("The words and acts relied upon must…admit of no other interpretation than that the property was to be held in trust.") (citing In re Estate of Fontanella, 33 A.D.2d 29, 31 (3d Dep't 1969)); Beaver v. Beaver, 117 N.Y. 421, 428 (1889).

### C. Application of Trust Law

Granting plaintiff every inference, there is no evidence "unequivocally" indicating that a trust was created by the Assignment. To the contrary, it states that the assignment of title was for the use and benefit of the Assignee.[14] Plaintiff's assertion that prior to making the Assignment he was promised that none of his rights would change is insufficient to form the basis of a trust. As parole evidence, it must clearly indicate that, despite the language of the Assignment belying a trust, one nonetheless was created. Furthermore, there is no claim or even a suggestion that the plaintiff's rights to royalties as licensor merged into the Assignment, nor is there any asserted claim that the plaintiff no longer receives royalties or that the defendant has denied he is still entitled to receive them.

Plaintiff asserts that his claims relating to the Assignment should not be dismissed for the following reasons, each of which will be addressed:

(1) Under the license agreement, he asserts, rights beyond the right to receive royalties were reserved to him. For example, under 2.03 of the License Agreement he was entitled, at his own expense, to pursue any patent application or patent in the event the defendant decided not to. Pls. Mem. 19-20. Although it may be, all other things being equal, that the License Agreement and the rights and obligations incident thereto merged into the Assignment of plaintiff's title interest to the patent, no claim to that effect is raised by the defendant. On the contrary, the facts as alleged in the Amended

---

[14] It states in relevant part:
Assignor has sold, assigned and transferred...the entirety of the partial right, title and interest of Assignor in and to the aforesaid patents...and each and every patent that may be issued on the aforesaid inventions in the United States of America and...in all countries foreign...to be held and enjoyed by the Assignee for its own use and benefit...
(Def. Mem., Ex. B, "Assignment").

Complaint are instinct with a continued recognition that the License Agreement survived the grant of the Assignment. It is clear that KC recognized its duty to pay royalties to Jacob as recently as March of 2004, when it remitted a check to him for unpaid royalties. Indeed, KC maintains that Jacob "retains all of his rights under the License Agreement, and KC has never argued otherwise." Def. Mem. 5.

Plaintiff's asserted right to reassignment of the patents under §2.03 is therefore still held by the plaintiff. However, this "right" merely entitles Jacob to take possession of patents abandoned by KC, at its sole discretion. There is no legal basis for asserting that the Assignment suddenly obliged KC to exercise the discretion to abandon patents under the License Agreement for Jacob's benefit. Moreover, since the right to claim abandoned patents still lies with Jacob, whatever entitlement it provides him still resides with him. As such, it cannot form a beneficial interest transferred to defendant.

(2) Jacob claims that "under the License Agreement [he] retained the right to pursue claims against patent infringers." (Pls. Mem. 20). In this regard he is mistaken. Section 9.01 of the License Agreement is explicit in providing that the licensee shall have the right, "in its sole discretion and at its sole expense… to…prosecute in Licensor's name…" (Agmt. § 9.01).

Jacob's assertion that he retains the right because 9.01 doesn't use the words "exclusive right" is frivolous. Although Licensor can be independently represented in any litigation over the patents, "Licensee shall have the sole right to conduct such proceedings and to enter into any settlement thereof." Agmt. § 9.02. The language hardly admits of a right retained by plaintiff to prosecute infringers. Indeed, the License Agreement contained numerous obligations on the part of licensor to cooperate with

18

licensee in its preparation, filing, prosecution, and maintenance of the patents. See, Agmt. §§ 2.02-2.03. Since plaintiff had no right to prosecute infringers under the License Agreement, he could not have transferred it as a res of the trust under the Assignment. KC is under no obligation to prosecute infringers for his benefit or at his discretion by virtue of the Assignment. Indeed, if it owed him any duty, it was only that of good faith, imposed upon all contracts and actionable under plaintiff's contract claims. The trust cause of action must therefore be dismissed.

Since plaintiff's trust claims have been rejected, it follows that all the "remedial claims" stemming exclusively from the trust claims must be dismissed. Therefore, the third cause of action ("fiduciary duty violations"), and sixth cause of action ("rescission"), must be stricken from the Complaint.

The eighth cause of action ("accounting") can be supported on the ground that an assignor of a patent right is entitled to an accounting. "The right to decree of accounting of profits and damages is incidental and subsidiary to the injunctive relief." De Mille Co. v. Casey, 201 N.Y.S. 20, 27 (N.Y. Sup. 1923) (citing De Bekker v. Frederick A. Stokes Co., 219 N.Y. 573 (N.Y. Ct. App. 1916)). Therefore, the trust theory of the Amended Complaint fails, but the possibility of an accounting based on breach of the License Agreement does not.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the first, second, third, fifth, sixth, seventh, ninth, eleventh, fifteenth, sixteenth, and seventeenth causes of action is granted. It is also ordered that the fourth cause of action be stricken from the Amended Complaint, with leave to amend this claim.

SO ORDERED.

Dated:	June 5th, 2006
	Brooklyn, New York

_____/s/_____
I. Leo Glasser
United States District Judge


On this day, copies of the foregoing were sent to:

Bernard Malina
Malina & Associates, P.C.
60 East 42nd Street
New York, NY 10165

Attorneys for Plaintiff

Anthony S. Baish and Daniel T. Flaherty
Godfrey & Kahn, S.C.
780 North Water Street
Milwaukee, WI 53202

George A. Salter
Hogan & Hartson, LLP
875 Third Avenue
New York, NY 10022

Attorneys for Defendant